UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
| v. | ) ) | Criminal No. 25-cr-10003-PBS |
| THOMAS F. CLASBY, JR., | ) ) | |
| Defendant | ) | |

**GOVERNMENT'S MEMORANDUM REGARDING
SENTENCING AS TO THOMAS F. CLASBY, JR.**

Thomas F. Clasby, Jr. served as the Director of Quincy Elder Services for 25 years before

he was fired in May 2024. Clasby ruled Elder Services with a firm hand; everyone knew that he

reported directly to his close friend, Quincy Mayor Thomas P. Koch.

But for years, Clasby had been leading a double life, stealing from Elder Services to buy

things for himself, his wife and his son, and to support his secret girlfriend. Clasby had no

shame, flaunting his theft among the Kennedy Center employees because he knew they would be

too scared of his relationship with Mayor Koch to report him. Unfortunately for Clasby, he

underestimated women whose courage broke this case in April 2024 and led to the discovery of

over $136,000 in missing funds and a quarter of a century of misplaced trust.

Clasby deserves a sentence of 13 months in prison not just because he stole over

$136,000, but also because he abused the trust of so many people, including elderly Quincy

residents and Elder Services employees, when he used Elder Services money to buy things like

steak tips for himself, an electric fryer for his son, and a Toyota Prius for his girlfriend. The

circumstances, set forth in more detail below, more than warrant a 13-month sentence.

1

I.      **Thomas F. Clasby, Jr.'s Criminal Conduct**

Thomas F. Clasby, Jr. (Clasby) served as the Director of Quincy, Massachusetts Elder Services (Elder Services) from 1999 until he was fired in May 2024. Elder Services operates in a City-owned building called the Kennedy Center, where Quincy Council on Aging (the COA) members are offered activities and classes, some of which were free and some of which require a small fee. The Kennedy Center also hosts a café where COA members can purchase small food and drink items—*e.g.*, a cup of coffee, a hot dog, a bag of chips.

As the Director of Elder Services, Clasby was responsible for approving purchase orders, ensuring all cash and checks received by Elder Services were delivered to the City of Quincy Treasurer-Collector's Office, and for general oversight of Elder Services. On March 9, 2026, Clasby pled guilty to abusing the extraordinary power he wielded over the Elder Services fisc by forging invoices and stealing cash for his own personal use.

A.   *Clasby Admittedly Submitted False Invoices Totaling $61,737.71*

At his Rule 11 hearing, Clasby admitted that he submitted false invoices totaling $61,737.71 to cover personal expenses and generate cash for himself.

First, Clasby admitted that he caused the City to pay the following personal expenses by falsifying invoices and lying to his Assistant Director and others about the following:

- A $4,800 Toyota Prius, $1,187 in repairs and $1,124 in towing for his longtime female friend and sometime romantic partner.

- $2,236 for 153 pounds of bourbon steak tips.

- $810 for 27 fleece vests bearing the phrase "Men of Divine Mercy," which Clasby distributed to members of the men's Catholic organization to which he and Mayor Koch belonged.

2

- $8,950 paid to a music studio to produce recordings of Clasby singing songs for his wife and others.[1]

- A $1,912 snowblower and over $200 in equipment he used bring the snowblower home in his City-owned truck.

- $143 in clothing embroidered with the logo of the Franciscan University of Steubenville, from where Clasby received his undergraduate degree in 1995.

- $325 to clean the apartment of the female friend.

- $595 for an electric fryer for his son.

- $1,320 to reupholster a loveseat owned by Clasby.

Second, Clasby admitted that he invoiced the City for $38,134 in services never provided to anyone, in a scheme that Clasby used to generate additional cash. Specifically, Clasby's long-time friend had a New York consulting company (the Company). Beginning in May 2022, Clasby manufactured Company invoices that falsely stated the Company had provided classes and supplies to Elder Services, keeping each invoice below $10,000 to avoid triggering state bidding requirements and increased scrutiny from the City's procurement officials. Based on the false invoices, the City sent checks to the Company in New York via United States Mail, and Clasby's friend cashed the City checks and provided the vast majority of the cash to Clasby,

---

[1] Clasby raised an objection to the Presentence Report (PSR) in that it suggested that "the recordings had no connection to Mr. Clasby's longstanding musical activities associated with Elder Services and were 'for Clasby's wife.'" Clasby specifically referenced his past performances of Irish music at Kennedy Center events and incorporation of music into programming offered through Elder Services, but ultimately Clasby has not contested inclusion of the $8,950 in the loss calculation. Moreover, none of those involved in these studio recordings would testify that they had anything to do with the Kennedy Center or Elder Services, including Clasby's own close friend, another City employee and Men of Divine Mercy member who played guitar for two of the studio sessions and who testified that he believed Clasby was personally paying for studio time because Clasby told him that the songs were for Clasby's wife.

delivering it to Clasby in brown paper bags at a Mass Pike rest stop and the Bridgeport, Connecticut ferry terminal, among other locations.

It is undisputed that Clasby's false invoice scheme caused a loss of at least **$61,737.71**.

B. *Clasby Submitted a False Invoice for $1,658 for a Portrait Meant for His Wife*

In May 2023, Clasby approved payment of invoice in the amount of $1,658 to Miller Studio, Inc., which covered (a) a Portrait Sitting of Clasby, (b) a 20 x 24 Signature Portrait, lacquered and mounted for framing, and (c) a custom frame with linen liner and museum glass. Clasby has objected to the inclusion of this invoice amount in the calculation of his loss.

The government anticipates that the evidence it will present at the sentencing hearing will establish by a preponderance of the evidence that, in April 2023, Clasby sat for a portrait with Miller Studio Photography after telling Elder Services Assistant Director Marie Ferent (Ferent) that he needed a new headshot for the City website. Clasby then ordered a signature portrait of himself, lacquered, mounted, and framed by Miller Studio. Clasby told Ferent that he had the portrait done for his wife, and submitted the invoice for $1,658 to the City for payment. The portrait was seized during the search of Clasby's office:



Accordingly, it is the government's position that the cost of the portrait should be included in the calculation of loss, bringing the total loss from the invoice portion of Clasby's scheme to **$63,395.71.**

### C.  *Clasby Stole $72,666 in Cash from the Kennedy Center[2]*

Clasby also admittedly stole cash from the Kennedy Center, but he has objected to the government's calculation of the missing case as unreliable and speculative. While "[t]he government bears the burden of proving the loss by a preponderance of the evidence, . . . [t]he sentencing court has considerable discretion in determining what evidence should be regarded as reliable in making findings as to the amount of loss." *United States v. Kumar*, 112 F.4th 30, 36

---

[2] The government submitted to Probation a cash loss amount which included an estimated $8,670 in cash collected at the café during the relevant time period. For reasons set forth below, the government will not seek to include the café cash loss at sentencing.

(1st Cir. 2024) (cleaned up). Moreover, a court's "loss calculation need not be precise: the sentencing court need only make a reasonable estimate of the range of loss." *Id.* (cleaned up).

The government anticipates presenting evidence at the sentencing hearing which will establish the following facts by a preponderance of the evidence. Every City department is required to remit any cash and checks it receives to the City's Treasurer-Collector's Office on a regular basis with a Schedule of Departmental Payment to Treasurer, which is also referred to as a "Turnover Sheet." A Turnover Sheet should contain the account number for deposit and an itemization of cash and checks received during the relevant time-period, and it should be signed by the relevant department head. The department heads are responsible for ensuring the Turnover Sheets, cash and checks are brought to the Treasurer-Collector's Office.

One of the deposit accounts for Elder Services was the Donation Account. Funds remitted for classes, activities, newsletter subscriptions, the café, and donations to Elder Services were credited to the Donation Account.[3] During the relevant time period, funds were accepted at the Kennedy Center by workers at the front desk in the form of cash and checks, and cash receipts were generally placed in envelopes with notations including the date of receipt and the purpose of the funds. For example, an envelope containing fees for a yoga class might contain the date and read: "$100 yoga," and an envelope for the café receipts might contain the date and read: "$79 café."

Elder Services did not maintain logs of payments received at the front desk, or in the café. However, the Kennedy Center used a computer program called My Senior Center, and

---

[3] Funds remitted for transportation services through Elder Services were remitted to the Transvan Program account.

whenever a COA member arrived at the front desk, the member would sign into My Senior Center and indicate an activity for which they were checking in, *e.g.*, yoga, acrylics, strength training, or a café visit. My Senior Center maintained this data going back to at least 2018.

Before the Kennedy Center was closed due to the COVID-19 pandemic in March 2020, Clasby had been taking cash receipts from the Kennedy Center and keeping them for himself. However, at least some of the cash was reported on Turnover Sheets and delivered to the Treasurer-Collector's Office before March 2020. Between March 2020 and June 1, 2021, the Kennedy Center was closed due to the COVID-19 pandemic.

In March 2021, when reopening was contemplated, Clasby had Assistant Director Ferent buy a safe for the Kennedy Center through the City's Amazon account. When the Kennedy Center reopened to visitors in June 2021, Clasby told Kennedy Center employees that all cash would be deposited into the safe. While anyone could make deposits into the safe through a hopper door, only Clasby accessed the safe before April 18, 2024.

Between June 2021 and April 2024, Clasby opened the safe, removed cash envelopes, and kept all the cash that had been collected by the Kennedy Center. Searches of Clasby's office and his City truck revealed several of these envelopes torn open with no cash inside.

In April 2024, Kennedy Center employees reported Clasby's cash and invoice fraud theft to individuals outside of the Kennedy Center, and City Treasurer-Collector Molly Smith installed an employee at the Kennedy Center to supervise cash intake for approximately five weeks. According to Turnover Sheets prepared by the Treasurer-Collector, the weekly cash receipts from the Kennedy Center to the Donation Account during that time period averaged approximately $2,000 per week.

The City and its outside auditors provided Turnover Sheets and My Senior Center data for the time period June 2021 through April 2024, during which Clasby was stealing the cash receipts from the Kennedy Center, to the Federal Bureau of Investigation (FBI). The City also provided a list of activities and classes offered at the Kennedy Center during the relevant time period, and the fees charged for each activity or class. An FBI Forensic Accountant used that data to calculate the total fees that should have been collected at the Kennedy Center during the relevant time period, and then deduct the fees that were remitted to the Treasurer-Collectors Office in the form of checks. The total missing cash for activities and fees is **$72,666.**

Notably, this number does not include any cash collected at the café during the June 2021 through April 2024 time period, which Clasby also stole. My Senior Center data indicated that there were approximately 8,670 visits to the café during those almost three years. Even if every senior visiting the café bought the cheapest item on the menu—a $.50 brownie—Clasby is getting a $4,335 credit to his loss calculation. Moreover, the 8,670 visit number from My Senior Center would not include COA members who checked in for a class or activity, and then bought something at the café—they would not have had to check in again for the café—nor does it include City workers who stopped by the café for what was known as the best lunch deal in the City. This cash collected at the café, deposited in the safe and taken by Clasby is all unaccounted for. However, Clasby has objected to the cash loss calculation, in part, because he alleges that he made cash purchases for the Kennedy Center. In fact, there are some, very limited, receipts which reflect cash purchases of café supplies during the relevant time period—which purchases violated City purchasing guidelines but nonetheless could be deducted from the loss calculation. Accordingly, even though there is no evidence that the café was simply breaking even during the

8

June 2021 to April 2024 time period, as opposed to making a profit, the government has agreed to credit the café cash and exclude it from the loss calculation at sentencing.

Accordingly, **$72,666** is a conservative and entirely reasonable estimate of the total cash Clasby stole during the relevant time period.

## II.      U.S. Sentencing Guidelines Calculation

The total loss attributable to Clasby's fraud is **$136,061.71**, and the government agrees with the United States Sentencing Guidelines (USSG) calculation set forth by Probation in the Final Presentence Report (the PSR):

| U.S. SENTENCING GUIDELINES CALCULATIONS<br>18 U.S.C. §§ 666(a)(1)(A), 1341, 1343, 2314 (Counts One-Twelve) | |
| --- | --- |
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Loss between $95,000 and $150,000 (U.S.S.G. § 2B1.1(b)(1)(E)) | +8 |
| Abuse of Position of Private Trust (U.S.S.G. § 3B1.3) | +2 |
| *Adjusted Offense Level* | *17* |
| | |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a) and (b)) | -3 |
| | |
| Zero-Point Offender (U.S.S.G. §§ 4C1.1(a) and (b)) | -2 |
| | |
| **TOTAL OFFENSE LEVEL** | **12** |

## III.      The 3553(a) Factors

### a.   *The Nature and Circumstances of the Offense Warrant a 13-Month Sentence*

Clasby's crimes were serious, and they deserve serious punishment. The total loss resulting from Clasby's crime is over $136,000. But Clasby's fraud is not just a financial crime, it was a calculated and deliberate betrayal of trust. Elderly Quincy residents trusted Clasby with their money, and Clasby used their money to treat himself to steak tips and a snow blower, and to buy gifts for his wife, his son, and to pay rent for his girlfriend.

Clasby's crimes were not a momentary lapse in judgment, one bad choice, one error in judgment, or one mistake. He stole from the City and its elderly residents thousands of times over the course of at least four years, and he would have continued to steal from the City had he not been caught. And it is important to note that ***he was caught*** – he would have kept going, if his employees had not been brave enough to finally speak up, despite his self-professed connections to Mayor Koch.

Moreover, Clasby's theft was driven not by necessity, but by his own greed and desire. Clasby earned $140,000 a year as the Director of Elder Services, he was not struggling financially. He stole cash from the Kennedy Center not because he needed to put food on the table, he did it to financially support his secret girlfriend without his wife knowing. Given the nature and circumstances of Clasby's fraud, he deserves a significant prison sentence.

b.  Clasby's History and Characteristics Warrant a 13-Month Sentence

Clasby's history and characteristics, too, justify a 13-month sentence. He had "an almost idyllic childhood" in an "emotionally and financially secure environment." PSR ¶ 55. He has a supportive family, including his sister and wife. *Id.* ¶¶ 63, 64. Clasby had a 27-year career with the City. *Id.* ¶ 73. He has had many advantages in his life, advantages that many defendants who come before this Court for sentencing have lacked. In spite of those privileges, he stole from people who trusted him, including elderly patrons of the Kennedy Center who paid $3 cash for yoga classes, trusting that their cash would make it into the City's coffers and not end up in Clasby's own pockets.

To the extent Clasby may argue that his lack of criminal history, career prior to his fraud, commitment to his family, or the collateral consequences associated with this conviction support

a downward variance, his claims are without merit. The Guidelines generally prohibit consideration of socioeconomic status, successful employment history, family responsibilities and reputational collateral consequences in fashioning a sentence. *See* 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to . . . socioeconomic status of offenders."); *see also* U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant); U.S.S.G. § 5H1.10 (socioeconomic status not relevant). Indeed, courts have "repeatedly expressed a distaste for sentencing that reflects different standards of justice being applied to white and blue collar criminals," based on the need to deter large-scale fraud and the possibility that a lenient sentence may "undermine[] public confidence in whether the justice system is doing equal right to the poor and the rich as our oath requires." *United States v. Hoffman*, 901 F.3d 523, 556-57 (5th Cir. 2018) (internal citation, quotation marks, and alterations omitted); *see also, e.g.*, *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (emphasizing importance of "the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

Thomas F. Clasby, Jr. knew right from wrong, and he understood his fiduciary duties to the City. Given Clasby's history and the circumstances of his fraud scheme described above, a 13-month prison sentence is appropriate.

    c.   A Sentence of 13 Months Reflects the Seriousness of the Offense, Promotes Respect <u>for the Law, Provides Just Punishment, and Serves the Goals of Adequate Deterrence</u>

The need for general deterrence also weighs in favor of the government's sentencing recommendation because Clasby's position as a trusted City employee and his closeness to the Mayor made his theft difficult to detect and report, as evidenced by the years that went by before his scheme was uncovered. A meaningful sentence is necessary to deter other public employees from engaging in this kind of theft and to encourage other potential whistleblowers to come forward.

Moreover, a sentence of 13 months fits squarely within the range of reasonable sentences imposed for similar conduct—that is, city employees stealing from the employers who trusted them. For example, in 2017, Judge Sorokin sentenced former Quincy Police Department Lieutenant Thomas Corliss to one year and one day in prison after being convicted at trial for defrauding the police department of $8,000 in overtime pay. *United States v. Corliss*, 1:16-cr-10250-LTS (Docket No. 94). More recently, in 2026, Judge Talwani sentenced former Boston City Councilor Tania Fernandes Anderson to one month in prison for stealing $7,000 in bonus money she caused to be paid to a City employee. *United States v. Anderson*, 1:24-cr-10364-IT (Docket No. 67).

A sentence of 13 months is just punishment for Thomas F. Clasby's crimes. It is a sentence that promotes respect for the law, and that will serve the goals of specific and general deterrence.

## IV.   CONCLUSION

For the foregoing reasons and those outlined in the PSR, the government recommends a

sentence of 13 months' imprisonment, three years of supervised release, restitution of

$136,061.71 to the City of Quincy, forfeiture, and a $1,200 special assessment.

Respectfully submitted

LEAH B. FOLEY,
UNITED STATES ATTORNEY

Date:   June 10, 2026             By:   */s/Kristina E. Barclay*
                                        KRISTINA E. BARCLAY
                                        Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to
the registered participants as identified on the Notice of Electronic Filing (NEF).

Date: June 10, 2026                    */s/Kristina E. Barclay*
                                       Kristina E. Barclay
                                       Assistant United States Attorney

13