UNITED STATES DISTRICT
COURT DISTRICT OF
MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 1:25-cr-1003 |
| | ) |
| THOMAS CLASBY | ) |

**DEFENDANT THOMAS CLASBY'S**
**SENTENCING MEMORANDUM**

Mr. Thomas Clasby respectfully requests a sentence of time served (1 day), followed by three years of supervised release with such conditions as the Court deems appropriate, including restitution, continued mental health treatment, and any additional conditions necessary to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a), including, for example, a period of home confinement.

Mr. Clasby stands before this Court having pled guilty to offenses arising from his conduct while serving as Director of Elder Services for the City of Quincy. Mr. Clasby accepts full responsibility for his conduct and is committed to making the City of Quincy whole as quickly as possible. To that end, he has already begun the process of waiving retirement-related proceedings that could delay access to available retirement contributions and intends to apply those funds toward restitution immediately. Based upon information provided by counsel for the Quincy Retirement Board, Mr. Clasby anticipates satisfying his restitution obligation in full by approximately the end of August 2026.

Mr. Clasby understands that his actions damaged public confidence, disappointed colleagues and supporters, and undermined an institution dedicated to serving Quincy

1

seniors. He further recognizes that many of the people who trusted him feel hurt, angry, and betrayed. Nevertheless, Mr. Clasby asks the Court to consider the entirety of the person standing before it and to impose a sentence sufficient, but not greater than necessary, to satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553(a). The requested sentence recognizes the seriousness of Mr. Clasby's offenses, reflects the significant collateral consequences he has already faced and will continue to face, ensures prompt restitution to the city of Quincy, and accounts for the history and characteristics of Mr. Clasby, a 62-year-old man with no prior record.

By way of background, Mr. Clasby pled guilty to: (1) Theft Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. § 666(a)(1)(A) and 2; (2) Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2; (3) Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 2; and (4) Interstate Transportation of Stolen Property, in violation of 18 U.S.C. §§ 2314 and 2.. There is no plea agreement in this case. Although Mr. Clasby previously submitted objections to portions of the Presentence Investigation Report, he no longer contests the advisory guideline calculation ultimately adopted by Probation. While Mr. Clasby may not agree with every factual characterization advanced by the government, he agrees with the most important fact: he abused a position of public trust and betrayed responsibilities he should have honored.

## I.     The Proposed Sentence is Sufficient and Not Greater Than Necessary Under the Factors Identified in §3553(a)

The Court's task under 18 U.S.C. § 3553(a) is not merely to calculate a guideline range. It is to impose a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing. In doing so, the Court must consider both the nature of the offense and the history and characteristics of the person who committed it.

For decades, Mr. Clasby was a dedicated public servant who did meaningful work on behalf of Quincy's senior population. He is before this Court because, over time, he lost sight of the boundaries that should have governed his conduct. Personal interests, institutional resources, friendships, obligations, favors, and public responsibilities became blurred in ways that were improper and ultimately criminal. In doing so, Mr. Clasby betrayed the trust that the City of Quincy and its residents placed in him.

At the same time, the offense conduct does not tell the entirety of Mr. Clasby's story. For more than twenty-five years, Mr. Clasby devoted his professional life to Elder Services. He helped seniors obtain transportation, meals, medical care, counseling, benefits assistance, social programs, and other resources that continue to benefit the community today. He remained a devoted father to his teenage son Kent, provided support to his sister after the devastating loss of her young son to a cancerous brain tumor.  He volunteered at homeless shelters and soup kitchens, supported grieving families, cared for aging relatives, opened his home to a foster child, and became the sort of person many people called when they needed help. None of those things were fictional. None were invented for sentencing. While the broader picture does not excuse Mr. Clasby's conduct, it provides important context when determining what sentence is sufficient, but not greater than necessary, under 18 U.S.C. § 3553(a).

A. *Mr. Clasby's History and Characteristics*

1. Mr. Clasby's public service and work on behalf of Quincy seniors

Mr. Clasby began his career in local government in 1997, when he was appointed by Quincy Mayor James Sheets to serve as Manager of Transportation and Housing for the Department of Elder Services. PSR ¶ 73. In that role, he worked with federal, state, and local officials on efforts to convert military housing into a senior living campus. During this period,

Mr. Clasby also expanded transportation options available to Quincy seniors and helped implement the TransVan program, which provided transportation services to elderly residents throughout the City.

In December 1999, Mayor Sheets promoted Mr. Clasby to Director of Elder Services. PSR ¶ 8. In that role, Mr. Clasby developed and expanded programming designed to address the needs of Quincy's growing senior population. He hosted "Elder Update," a weekly public-access television program focused on issues affecting seniors and served on a variety of boards and advisory committees relating to elder affairs.

When Mr. Clasby became Director of Elder Services, Quincy did not have a dedicated senior center. Programs serving approximately 17,000 seniors operated out of schools, halls, and clubhouses scattered throughout the city. Seniors seeking social, educational, recreational, and support services were required to navigate a patchwork of locations throughout Quincy. Ex. 1 (Articles).

As Director, Mr. Clasby spent years advocating for the creation of a centralized facility where seniors could access services, programs, and social opportunities in one location. Those efforts ultimately resulted in the renovation of the former Beechwood building and the opening of the Kennedy Center in 2009. The Center became Quincy's first dedicated senior center and included art rooms, music rooms, computer facilities, meeting spaces, counseling services, and a café designed to foster social connection among older adults.

For Mr. Clasby, however, the building itself was never the point. The goal was to combat isolation and help seniors remain active, engaged, and connected to their community for as long as possible. Under his leadership, the Department expanded transportation services, social programming, educational opportunities, exercise classes, arts programs, and support services for

elderly residents throughout Quincy. The impact of those efforts was significant. By 2019, approximately one hundred seniors were attending the Kennedy Center daily. Ex. 1. For many, the Center became a second home, a place to socialize, exercise, learn, receive assistance, and remain connected to the community.

That commitment became particularly evident during the COVID-19 pandemic. When public health restrictions forced the closure of the Kennedy Center, Mr. Clasby and his staff continued serving seniors in different ways. Ex. 1. They conducted wellness checks, coordinated transportation for medical appointments and treatments, helped connect seniors to available resources, and worked to address the profound isolation many elderly residents experienced during that period. Mr. Clasby publicly expressed concern that social isolation posed a serious threat to the wellbeing of older adults who depended on the Center not only for programming, but also for companionship and support. Ex. 1.

Today, the Kennedy Center continues to serve Quincy residents. Mr. Clasby neither claims nor deserves sole credit for that institution. It exists because of the efforts of many public servants, employees, volunteers, donors, elected officials, and seniors themselves, but it is equally true that Mr. Clasby devoted a substantial portion of his professional life to building, expanding, and sustaining services for older adults, and those efforts continue to benefit the community even today.

2.  Mr. Clasby's learning disabilities and educational background

Mr. Clasby has lived with significant learning disabilities for virtually his entire life. As reflected in the PSR, he suffers from a visual-memory learning disability, a condition that affects the ability to store, recall, and process written information. PSR ¶ 70.

5

As a child in the 1970s, long before many educational supports existed in their current form, Mr. Clasby struggled academically and often felt different from his peers. What began as concerns about his reading and processing abilities ultimately led to his participation in special education services during the early years of Massachusetts' Chapter 766 program. The effects of those disabilities extended far beyond the classroom. Mr. Clasby struggled with reading speed, processing written information, spelling, and organization.

Those challenges followed him into adulthood. Mr. Clasby initially attended college but struggled academically and ultimately left school. PSR ¶ 71. However, rather than abandoning his education, Mr. Clasby persisted. He returned to Quincy College, earned an Associate of Arts degree in American Government in 1993, and then returned to Franciscan University of Steubenville, ultimately earning a Bachelor of Arts degree in History and Political Science in 1995. PSR ¶ 71. Obtaining those degrees required substantially more effort than it did for many of his peers and remains a source of pride. At the same time, the feelings of inadequacy created by his learning disabilities never entirely disappeared.

3.  Mr. Clasby's family history and role as a caregiver

Family has always occupied a central role in Mr. Clasby's life. He is a husband, father, brother, uncle, caregiver, and foster parent. Of all those roles, however, none is more important to him than being a father.

Mr. Clasby is the father of seventeen-year-old Kent, who will enter his senior year of high school this fall. PSR ¶ 62. Throughout Kent's life, Mr. Clasby has been a constant and active presence. Because his schedule often provided greater flexibility than his wife's, he frequently assumed primary responsibility for many of the day-to-day aspects of parenting. He

attended school events, coached youth basketball, helped with schoolwork, and remained deeply involved in Kent's development and daily life.

The Court has received a letter from Kent describing a father who consistently provided guidance, encouragement, support, and stability. Ex. 2 (Letters). Their relationship remains exceptionally close. They spend time together nearly every day, share a love of music, and routinely eat dinner together as a family despite increasingly demanding schedules. Kent, an accomplished student-athlete and musician, is entering one of the most significant periods of his young life as he prepares for college applications, his final year of high school, and the transition to adulthood. While Kent is no longer a small child, he remains at a formative stage of life. The presence, guidance, and support of his father during this final year before adulthood is important not only to Mr. Clasby, but to Kent as well.  In addition, since this case, Kent has lived through the public investigation and prosecution of his father, the resulting media attention, and the emotional strain that inevitably accompanies such proceedings. More recently, he suffered the loss of his grandmother, with whom he shared a close relationship. Kent needs his father to remain present, as a consistent source of support, guidance, and stability.

Mr. Clasby's commitment to family extended beyond his immediate household. In 2017, he and his wife, Theresa Hazelrigg, completed the Commonwealth's certification process to become foster parents and welcomed a young child, Payton, into their home. PSR ¶ 62. Although Payton was eventually reunited with her biological family, the relationship did not end there. Mr. Clasby and his family continued to maintain a close relationship with her, remained involved in her life, and continued to treat her as part of their extended family. The PSR and the letters submitted to the Court further reflect Mr. Clasby's longstanding role as a caregiver within his extended family. His sister reports that when she struggled with alcoholism as a young adult, Mr.

7

Clasby helped her navigate some of the darkest periods of her life. She is now more than forty years sober and attributes much of that success to the support and encouragement he provided. PSR ¶ 64.

That same pattern of support continued throughout adulthood. Mr. Clasby remained exceptionally close with his sister and her family, particularly her son, John. When John was diagnosed with a brain tumor as a teenager, Mr. Clasby became a constant source of support. He accompanied family members through years of treatment, setbacks, surgeries, and uncertainty. While John went into remission for some years, his cancer returned.  Mr. Clasby again became a source of support to his sister and her family. His sister told Probation that Thomas was there "every step of the way." PSR ¶ 64. The illness and eventual loss of John was devastating to the entire family. Mr. Clasby and John shared an especially close bond. Mr. Clasby watched a teenager he loved fight courageously through years of treatment before ultimately succumbing to the disease as a young man.

At approximately the same time, Mr. Clasby was helping care for both of his aging parents. His mother suffered from Alzheimer's disease and progressive cognitive decline. His father suffered from pulmonary fibrosis. PSR ¶¶ 56-57. As their conditions worsened, Mr. Clasby became increasingly involved in their care, helping with appointments, transportation, shopping, daily needs, and the difficult tasks that accompany aging, illness, and loss of independence.

The year 2014 proved particularly devastating. Within a span of months, Mr. Clasby lost his mother, his nephew John, and his father. The losses came in rapid succession and left an enormous emotional void. Although he continued to function professionally and continued

caring for those around him, those closest to him describe a period marked by grief, shock, and emotional exhaustion.

Mr. Clasby's caregiving role did not end there. Numerous letters submitted to the Court describe the extraordinary care Mr. Clasby provided to his mother-in-law during years of declining health, kidney disease, dialysis treatments, and medical complications. Mr. Clasby's wife, Theresa, describes Mr. Clasby as a generous husband, who cared for her mother with patience and dignity, and always found a way to help his family even when doing so came at a personal cost. His community describes a man who regularly rearranged his own life to assist family members, attend appointments, provide transportation, and ensure that loved ones were cared for with dignity.  Mr. Clasby repeatedly devoted his time, energy, and attention to caring for others. Whether as a father, foster parent, son, brother, uncle, husband, or caregiver, he has spent much of his adult life showing up for family members during moments of illness, grief, hardship, and need. Ex. 2.

4.   Mr. Clasby's health supports a community-based sentence

Mr. Clasby is sixty-two years old and suffers from conditions that require ongoing treatment and monitoring. Mr. Clasby has long suffered from hypertension, for which he takes prescription medication, and was diagnosed with fatty liver disease in 2020. PSR ¶ 65. Most significantly, in 2021 he was diagnosed with hemochromatosis, a genetic disorder that causes the body to absorb and store excessive amounts of iron. PSR ¶ 66. Hemochromatosis requires lifelong monitoring, recurring laboratory testing, and therapeutic phlebotomy approximately every five weeks because otherwise, excess iron accumulates in tissues and organs, particularly the liver, heart, and pancreas, and can cause serious damage if left untreated. PSR ¶ 66.

The condition first came to light after Mr. Clasby began experiencing profound exhaustion and weakness following physical activity. As he reported to Probation, he often felt unable to move his limbs and suffered from a near-complete lack of energy. PSR ¶ 66. Following evaluation by specialists at Beth Israel Deaconess Medical Center, he underwent an intensive course of treatment consisting of recurring therapeutic blood draws designed to reduce the dangerous iron levels in his body. Initially, those procedures occurred weekly. Although his condition is now more stable, he continues to undergo therapeutic phlebotomy approximately every five weeks together with ongoing laboratory testing and medical monitoring. PSR ¶ 66.

Mr. Clasby's treatment is not elective. It requires ongoing compliance, regular testing of his iron levels, and continued access to specialized medical care. Mr. Clasby's sister, Maureen, expressed concern to Probation about the impact incarceration could have on his health, noting that he suffers from a significant genetic illness affecting his blood and requires continuing medical treatment. PSR ¶ 64. While the Bureau of Prisons is capable of providing medical care, the existence of these conditions further supports the conclusion that the purposes of sentencing can be fully achieved through a sentence emphasizing supervision, treatment, accountability, and restitution rather than incarceration.

In addition to these physical conditions, Mr. Clasby has engaged in mental health treatment, Mr. Clasby has actively engaged in mental-health treatment since the onset of this case with a provider he trusts, Derek Atheholt, with whom he has made therapeutic progress. See PSR ¶ 68. A sentence of time served, supervised release, and home confinement if necessary, would therefore serve the goals of punishment, deterrence, treatment, and accountability while avoiding unnecessary disruption of established medical care.

5.   The letters submitted to the Court reflect a lifetime of service to others.

10

Family, friends, former colleagues, community members, and individuals from entirely different parts of Mr. Clasby's life wrote letters in support of Mr. Clasby, repeatedly describing the same qualities: generosity, compassion, faith, reliability, and a willingness to help others.

Maureen Pelton, Mr. Clasby's sister, describes a brother who, from childhood, was "the first to stick up for someone being bullied" and who consistently befriended those who were lonely, shy, or struggling to fit in. Ex. 2. She recounts how Mr. Clasby stood by her through personal difficulties in early adulthood, helped care for their parents during serious illness, and became a critical source of support when her seventeen-year-old son was diagnosed with a cancerous brain tumor. When the cancer later returned, she explains that Mr. Clasby once again assumed responsibility for helping care for their parents so that she could focus entirely on her son's treatment and recovery. She concludes by observing that while no one is without faults, "Tommy has done much more good in his life than most." Ex. 2 (Letters).

Several letters describe years of assistance Mr. Clasby provided to individuals facing significant physical, developmental, and mental health challenges. Thomas Calabro, a registered nurse who has known Mr. Clasby for more than forty years, recounts Mr. Clasby's longstanding support of a man suffering from schizophrenia and severe anxiety. Ex. 2. For more than fifteen years, Mr. Clasby has spoken with him regularly, assisted him with shopping, checked on his wellbeing, and helped ensure that he remained connected to the community. Mr. Calabro also describes Mr. Clasby's assistance to a woman suffering from agoraphobia and anxiety, as well as a blind and hearing-impaired individual whom Mr. Clasby routinely transported to medical appointments and assisted with obtaining citizenship and identification documents.

Many writers describe a similar pattern. Whether helping neighbors attend medical appointments, supporting elderly residents, volunteering at homeless shelters, spending holidays

11

serving meals, or making himself available to those in need, Mr. Clasby repeatedly devoted his time and energy to people who needed help. Don Clancy describes Mr. Clasby's decades of volunteer work at the Long Island homeless shelter, including spending portions of Thanksgiving and Christmas there for more than twenty years.  Ex. 2. Christopher Riley similarly recounts years of volunteer service through his church and community organizations and describes Mr. Clasby as someone who consistently used his talents and time to benefit others. Ex. 2.

The letters also paint a consistent picture of Mr. Clasby as a devoted family member and caregiver. Multiple writers describe the extraordinary care he provided to aging parents and relatives. His cousin, Charles Coughlin, writes that Mr. Clasby taught him "what true family commitment should be" through the care he provided to his parents throughout their lives.  Ex. 2 His sister-in-law, Catherine London, recounts how Mr. Clasby welcomed his mother-in-law into his home, cared for her throughout years of chronic illness, accompanied her to appointments, and helped provide what she described as her "heaven on earth" during the final years of her life. Ex. 2.

Significantly, those closest to Mr. Clasby, his wife and his son, also wrote letters on Mr. Clasby's behalf.  His wife, Theresa, candidly describes her own anger, disappointment, and grief following the charges and the profound impact this case has had on their family. She acknowledges that her husband "should have known better" and describes how the plans they had built for retirement, financial security, and the future were suddenly gone. Yet despite her frustration, she asks the Court to consider the entirety of the man she has lived beside for more than two decades. Ex. 2. Over twenty-two years of marriage, Ms. Hazelrigg observed Mr. Clasby welcome vulnerable people into his life, offer assistance to friends, neighbors, and strangers, and routinely place the needs of others ahead of his own convenience. She recounts how Mr. Clasby

helped care for a mentally disabled woman whom others avoided, welcomed a foster child into their home and continued supporting that child even after reunification, opened their home to a family member struggling with severe post-traumatic stress, and became one of the primary caregivers for her mother during years of kidney failure, dialysis treatments, medical appointments, and declining health.

Finally, Mr. Clasby's seventeen-year-old son, Kent, describes a father who consistently listened, encouraged, advised, and supported him through the challenges of adolescence. He recounts watching his father care for an elderly grandmother living in their home, volunteer in the community, assist homeless individuals, and continue helping others even after losing his job.  Kent also describes asking his father why he chose to plead guilty, to which Mr. Clasby responded that he had done wrong and that the only way to make things right was to admit what he had done and accept the consequences of his actions. Kent writes that this response changed his own perspective and reminded him what it means to be a good human being.

These letters demonstrate that before this case, and throughout much of his life, Mr. Clasby devoted extraordinary amounts of time and energy to serving other people. They reveal a man who repeatedly showed up for family members during illness and grief, who helped vulnerable individuals when no one was watching, and who built meaningful relationships through service.

B.   *The Requested Sentence and Consequences Faced Reflect the Seriousness of the Offense*

1.   Mr. Clasby has faced significant consequences as a result of this case

A sentence of time served, substantial supervision, restitution, continued therapy, and home confinement would not trivialize the seriousness of the offense. Rather, it would recognize that

punishment has already begun, that significant punishment will continue for years to come, and that incarceration is not necessary to satisfy the purposes of sentencing in this particular case.

Mr. Clasby accepts responsibility for his conduct. He does not seek to characterize the offenses as bookkeeping mistakes, administrative oversights, or technical violations, nor does he suggest that decades of public service somehow excuse criminal conduct. Public officials entrusted with public resources must understand that abuse of that trust carries serious consequences. Here, however, the consequences have been severe and life-altering. Mr. Clasby has lost the career to which he devoted nearly three decades, will lose all retirement security, and has endured extensive public humiliation. Those consequences send a powerful message to other public officials that abuse of public trust carries devastating personal, professional, and financial consequences even where a lengthy custodial sentence is not imposed.

Most immediately, Mr. Clasby lost the career to which he devoted nearly three decades. The profession that defined much of his adult life ended abruptly and publicly. The reputation he spent years building within Quincy and the elder-services community was destroyed. The trust of colleagues, friends, community members, and supporters was shattered.

The public humiliation associated with that loss continues today. Mr. Clasby's downfall unfolded publicly and repeatedly. Local newspapers, television stations, and online publications extensively covered the investigation, charges, guilty pleas, and related proceedings. The details of the case became the subject of public discussion throughout the community he spent much of his life serving. The resulting humiliation extended not only to Mr. Clasby, but also to his wife, son, extended family, and loved ones.

The consequences began long before sentencing. On the morning of his arrest, federal agents arrived at Mr. Clasby's home while his wife, teenage son, and mother-in-law were present. Mr.

Clasby was removed from his home in handcuffs and transported to federal court for processing and his initial appearance. Mr. Clasby was fingerprinted, photographed, required to provide a DNA sample, subjected to a strip search, and held in a courthouse cell while awaiting his appearance before the Court. For Mr. Clasby, a sixty-two-year-old first offender with no prior criminal history, the experience was frightening and deeply impactful not only for him, but also for the family members who witnessed it.

Additionally, the financial consequences have likewise been devastating. Mr. Clasby enters sentencing having lost his career, his reputation, and much of the financial security he spent decades building. He faces the loss of pension benefits earned over a lifetime of public employment. Rather than contesting those proceedings, however, Mr. Clasby has elected to waive them in order to accelerate restitution to the City of Quincy. Restitution will consume essentially all available retirement contributions. Mr. Clasby enters his sixties having lost his career, his pension, and much of his future earning capacity.

The consequences will continue long after this case concludes. Because of the nature of the conviction and the publicity surrounding it, future employment opportunities will be substantially limited. Mr. Clasby will carry federal felony convictions for the remainder of his life. The public shame associated with this case will not disappear when sentence is imposed. In viewing the consequences Mr. Clasby has already faced as a result of this case, taken together with Mr. Clasby's age, acceptance of responsibility, health issues, and commitment to restitution, additional incarceration is greater than necessary to satisfy the purposes of sentencing under § 3553(a).

2. Restitution and accountability favor a community-based sentence.

15

Mr. Clasby has not merely expressed a desire to make restitution. He has taken concrete steps to do so. Following his guilty pleas, Mr. Clasby consulted with counsel for the Quincy Retirement Board regarding his retirement benefits and available annuity contributions. Based upon those discussions, Mr. Clasby elected to waive his rights to challenge pension forfeiture and related proceedings so that he could access available retirement contributions as quickly as possible and direct those funds toward restitution. According to information provided by counsel handling those matters, Mr. Clasby anticipates that the available funds will permit him to satisfy his restitution obligation in full by the end of August 2026.  He has already begun that process and is working proactively to ensure that payment occurs as quickly as possible. Specifically, Mr. Clasby intends to submit a written waiver to the Quincy Retirement Board in connection with the upcoming Section 15 proceedings currently scheduled to be considered by the Board. By waiving those proceedings, Mr. Clasby seeks to avoid delay and permit the Retirement Board to act as quickly as possible so that the available retirement funds can be distributed and applied toward restitution. Remaining in the community under supervision would allow Mr. Clasby to continue coordinating with counsel, financial institutions, retirement administrators, and the Court to ensure prompt payment of restitution. Mr. Clasby's requested sentence facilitates the restitution process while still imposing substantial accountability, better serving the interests of justice than a sentence that delays restitution.

## II.     Mr. Clasby's Recommendation Is Appropriate Under the Federal Sentencing Guidelines

In this case, the Court is well within its discretion to impose a sentence of time served, which aligns with the overarching principles of sentencing under 18 U.S.C. § 3553(a). Following *United States v. Booker*, 543 U. S. 220 (2005), the sentencing guidelines are "merely advisory,

which means that the district court has considerable leeway to impose a sentence that falls outside the range suggested." *See United States v. Robinson*, 433 F. 3d 31, 35 (1st Cir. 2005). The guidelines "are still generalizations that can point to outcomes that may appear unreasonable to sentencing judges," and *Booker* allows courts "to impose non-guideline sentences that override guidelines, subject only to the ultimate requirement of reasonableness." *See United States v. Jimenez-Beltre*, 400 Mass. F. 3d 514, 518 (1st Cir. 2006).

As discussed above, Mr. Clasby initially submitted objections to portions of the PSR. Those objections primarily concerned certain factual characterizations and aspects of the government's loss analysis. After careful consideration, however, Mr. Clasby no longer contests Probation's ultimate guideline calculation. While he may not agree with every factual detail advanced by the government, he accepts responsibility for the conduct that brought him before the Court and acknowledges that he abused a position of public trust.

However, the Guidelines cannot fully account for many of the circumstances present here. They do not account for the destruction of a decades-long public-service career. They do not account for the extraordinary public humiliation associated with a highly publicized corruption prosecution. They do not account for the loss of pension benefits earned over nearly three decades of public employment, nor do they fully account for Mr. Clasby's age, health conditions, family circumstances, commitment to restitution, or exceptionally low likelihood of recidivism.

The government cites other public-corruption cases in support of a custodial sentence. Those cases are informative, but they ultimately reinforce why sentencing must remain an individualized inquiry. For example, in *USA v. Corliss*, the defendant denied wrongdoing, proceeded to trial, and was convicted by a jury. Mr. Clasby, by contrast, accepted responsibility, entered guilty pleas without the benefit of a plea agreement, spared witnesses and victims the

burden of trial, and has taken meaningful steps toward rehabilitation and restitution. Those distinctions bear directly on considerations of remorse, acceptance of responsibility, deterrence, and future risk. Likewise, while the Court may consider the sentence imposed in *USA v. Fernandes Anderson,* the facts of that case are materially different from those presented here. Comparisons between public-corruption cases are inherently imperfect because they involve different defendants, different histories, different conduct, different losses, different victims, and different post-offense behavior. The lesson of Fernandes Anderson is not that every public-corruption case warrants the same sentence. Rather, it reflects the principle that sentencing courts must evaluate the unique circumstances of each defendant.

The individualized factors in this case favor Mr. Clasby's requested sentence. Given Mr. Clasby's age, health, acceptance of responsibility, commitment to restitution, extraordinary collateral consequences, and exceptionally low risk of recidivism, the defense respectfully submits that a sentence of time served followed by substantial supervision represents a sentence that is fully consistent with both the advisory Guidelines and the statutory purposes of sentencing.

### III.    Conclusion

For all of these reasons, and after consideration of the factors set forth in 18 U.S.C. § 3553(a), Mr. Clasby respectfully requests that the Court impose a sentence of time served followed by three years of supervised release, a sentence sufficient but not greater than necessary to accomplish the purposes of sentencing.

Respectfully submitted,
THOMAS CLASBY
By his attorney

/s/ Claudia Lagos

18

Claudia Lagos
B.B.O. #681504
Scully & Lagos
10 Post Office Sq, Suite 1330
Boston, MA  02109
Tel: 617-307-5055

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 12, 2026.

*/s/ Claudia Lagos*
Claudia Lagos

19